Today, with the regular course of cases, I'll turn the gavel over to Judge O'Malley. It's my understanding, Judge Post, that you have a motion that you'd like to make before the court. Thank you. I move the admission of Anu R. Salkar, who is a member of the bar in good standing of the highest courts of California and the United States Court of Appeals for the Tenth Circuit. I have knowledge of her credentials and am satisfied that she possesses the necessary qualifications. And I'd just like to add on personal note that this is once again one of those bittersweet moments where we're honoring one of our clerks, but coinciding with the sad fact that we have to recognize that she's leaving sooner rather than later. And I'd just like to say on a personal note what an absolute pleasure it's been to have her with us, what a contribution she's made on a personal level and on a professional level to the work we do here in the court. And it's truly, truly been a pleasure. And so with that, I move her admission. Any objections, Judge Mayer? No objections. Since we trust Judge Post's judgment, the motion will be granted. Welcome, Ms. Salkar, and we look forward to you appearing before the court in the future. With the appreciation of your right hand, we swear and affirm that you will comport yourself as an attorney and counselor of this court, upholding and abiding by the law, and to support the Constitution of the United States of America. I do. Congratulations, and welcome to the Bar of the United States Court of Appeals. Thank you, Counselor. We welcome you to the Bar. We'll now turn to our first case this morning, which is 2010-5150, Shoshone Indian Tribe v. U.S. You're Mr. Sash? I'm Richard Burley, Your Honor. Okay, and so you've split the time, so you're starting with the first portion. Yes, Your Honor. I'm Richard Burley. I represent the Northern Arapaho Tribe. With me is Harry Saxe, who represents the Eastern Shoshone. We're here because the Court of Federal Claims held that the tribe's claims arising out of certain oil and gas lease conversions are barred by the statute of limitations. Seven leases were converted from 1916 Act leases into 1938 Act leases. The 1916 Act leases are renewable, but the Secretary of the Interior can adjust the royalty rate, while 1938 Act leases are held by production with no opportunity to adjust the royalty. The government has admitted that the conversions were done contrary to law, without competitive bidding. The lower court acknowledged that the government may have misled the tribes by providing inadequate information. The government has admitted it never advised the tribes about the possibility of lost royalty revenue during renewal periods. There's also no question that the conversions ultimately led to the loss of tens of millions of dollars in lost royalties that they would have achieved under unconverted leases. The tribe's claim is not barred because their claim doesn't accrue for limitations purposes until the tribes either knew of their claim or should have known of it. Well, the government cites the 1959 letter and all of the tribe's involvement through the process as a response to the fact that they knew or should have known about the conversion. What's the problem with that? Yes, Your Honor. We view that as a red herring. Marvin Sinoski, who was attorney for the tribes, for one of the tribes at that time, was looking into an unrelated issue. Actually, the opposite issue. There were unproductive leases that oil companies were sitting on, holding in inventory, not developing, and not paying any royalties to the tribe. Mr. Sinoski was concerned that the government was not requiring the companies to go forward with their obligation to develop diligently. It's the exact opposite problem. And in our view, here we had productive leases. These converted leases were productive leases. And to say that when you look into one kind of breach or mismanagement, to say you're automatically on notice of the exact opposite kind of mismanagement. Well, the Court of Federal Claims at least believed that the letters were indicative of an understanding of the differences between the two leases and that therefore it would have triggered an obligation to inquire. Right. Your Honor, it's clear from the record that Mr. Sinoski did not have actual knowledge of those leases. And he was looking into a particular problem that the tribes were complaining about. And that was unproductive leases. To say that he should have been on notice to look into productive leases. Well, lawyers deal with problems. And the problem was unproductive leases. The problem today is the opposite. Those leases were productive at the time and there would be no reason for a lawyer to waste his client's money by looking into a non-problem at that time. At least from his standpoint, he had no actual knowledge. He was an excellent attorney. If he didn't have knowledge of it, I don't think anyone would have. And even the government says in its brief that from its standpoint it doesn't see why there was any problem at all. Their view was that there were no damages at that time and damages weren't foreseeable. We think that the damages were foreseeable but by the government, not by the tribes. I've actually got some questions on trespass. Given the division of time, I assume I should hold them for your colleague. Yes, Mr. Sachs, you'll deal with trespass issues. With respect to your first claim, as I understand it, your tolling essentially of the statute of limitations pending discovery is premised on substantial citation to common law trust principles and trust cases, correct? That's true, Your Honor. We also allege breach of statutory obligation. That's the second claim, correct? Well, we believe they're related, Your Honor. There are two leasing statutes. So your first claim, you say there was a breach of specific statutes but the tolling portion you rely on common law trust principles, correct? We believe they're related. We view it as a single claim. It is for breach of trust. There are statutes. We believe the Supreme Court views the scope of the trust responsibility as stemming first of all from statutes. And then from there, the common law does have a role. And this was enunciated clearly by the Supreme Court recently, but we believe that's always been the case. Do you think the Supreme Court recently said that the common law continues to fill in the interstices? I believe so, yes, Your Honor. At least that you can look to the common law to help fill in. The dissent said that in Hickory, but what did the majority say? The majority was focusing on what we believe is kind of a strange issue, and this had to do with what the attorney-client privilege, the scope of that privilege, which was very much a common law doctrine going back to England. So it was an unusual situation where they were addressing that. The courts have said that there is a strong trust, it's a sacred trust. The Supreme Court has said that in Mitchell. There are aspects of the common law. It's certainly special because the United States has a special relationship with the tribes, but it has all kinds of other sovereign responsibilities, and we understand that. Okay, so you don't think that despite the concerns expressed by the concurrence and the dissent that the majority meant to go as far as saying that common law trust principles simply don't apply? I don't believe they said that common law principles are irrelevant to the scope of the trust. I think they were concerned that there must be some clear basis for the trust in the statutes, but that you can look to the common law. There's certainly, if the common law is inconsistent with the special sovereign responsibilities of the United States, that's one thing. Here, we don't see that. So, you might want to return to your colleague now. I think I will. Thank you, Your Honor. Your Honor, Dillon Harry Sachse. I would like to address this Mitchell issue first. I think the Mitchell case strongly supports our case. The court in Mitchell said, the power existing, and I'm quoting from page 12, the power existing in Congress to administer upon and guard the tribal property, and the power of being political and administrative in its nature, the manner of its exercise is a question within the province of the legislative branch to determine. Now, what we have here is the 1916 Act, very clear, the government violating it, admitting it. The 1938 Act, very clear, that it requires public bidding on leases, the government violating that and admitting it. So, the government is doing exactly the opposite of what the Supreme Court said in Hickory. And Hickory goes further, and I'm quoting also from page 12. We do not question the undisputed existence of a general trust relationship between the United States and the Indian people. And they quote Mitchell too, which is one of the primary cases that we rely on. That's the one where a tribe's timber was cut and the government didn't replant it. And the court held the government was liable for that. And the district court here has relied on, the court claims here, has relied on Mitchell too in a prior decision in our case, already holding that it's money mandating if they violate the 1938 Act. And the court goes on in Hickory to say, the government following a humane and self-imposed policy has charged itself with moral obligations of the highest responsibility and trust, obligations to the fulfillment of which the national honor has been committed. I can't think of anything that supports the position we're taking more than this does. And I'd like to turn now to the other thing that was asked, because I was practicing with Marvin Sinoshki. I actually drafted the complaint in this case in 1979. We didn't have the least idea that the government had done anything as crazy as to convert a 1916 Act lease to a 1938 Act lease without doing the public bidding. And the statute is clear. The statute is absolutely clear. So why aren't you charged with recognizing the clarity of the statute? Because none of us knew it had happened. Let me finish my question at an earlier date. None of us knew it had happened. You know, some tribal council in the 1950s knew, but was assured it was perfectly fine. And there was no damage from it for 10 or 15 years after that. When we became their lawyers, nobody knew this had happened anymore. This was... I know you're doing a lot of testifying here, but we have to go with just bits of the record, and it would be helpful to me if you'd stick to the record. Okay. I'd like to do one thing off the record, but I think that you can take judicial notice of. This suit was filed in 1979. 1982, there were scandals about how badly the government was keeping its records on Indian oil and gas. It led to a report called the Linode Report. And as a result of the Linode Report, the Mineral Management Service was established. And the government has done a much better job since the mineral management was established. But in those days before that, you couldn't get this kind of information from the government. When we're talking about the trespass claim, you're suggesting that the government had a fiduciary duty. I mean, what is the money mandating source on the trespass claim? It's the 1938 Act, which says you can't... It starts with the Indian Non-Intercourse Act, which says Indian land cannot be sold or leased without the approval of the United States. Then the 1938 Act, which says very specifically that if you're going to lease Indian land for oil and gas, you've got to have this public advertising. And that's terribly important. If it were the case that you didn't prevail on your first two claims and we were only looking at the trespass claim, then you would have to have a continuing trespass. So there would have to be an affirmative obligation to remove the trespassers during the period of the statute of limitations, six years prior to the assertion of the claim. Let me read you two quotations from the Court of Federal Claims in Cherokee I and Cherokee II, both of which were trespass claims with a claim brought against the United States for failing to remove the trespassers. Cherokee I, quote, In order to administer plaintiffs' mineral estate and collect royalties, the government must remove trespassers who take oil or gas illegally. Two years later, Cherokee II, 1992, this court has consistently treated each alleged trespass in the instant case as its own individual wrong. And that's the way it's done in oil and gas. It's horned with law in oil and gas. What's the difference between the oil and gas obligations of the government and those relating to coal mining that set you apart from Navajo Nation? Oh, well, that's very easy. And Justice Ginsburg recognized it in Navajo I that for coal mining, there's nothing very specific that the government has to do except to see that the royalties above a certain percentage, I've forgotten what it is, 2.5% or something like that. She has a footnote in which she says, I'm not saying this for oil and gas. She's saying they're just not deciding it. Huh? She just doesn't decide the question for oil and gas. Yeah, she doesn't decide the question for oil and gas. So tell me what actually makes oil and gas different. The very specific statutes and regulations and the duty that's given to the United States in supervising the production of oil and gas. All of which is very clear. And Judge Hewitt recognized that in her prior decision that there is a money mandating obligation as to oil and gas. And nobody appealed that to this court. And it's so clearly correct. You can't find a place where the statutes are more precise and detailed and where the government has a bigger role than in oil and gas. It's nothing like coal or gravel. You're into your rebuttal time. Would you like to say the remainder? I will stop and save the rest of my time for rebuttal except for one thing that I want to bring to your attention. Justice Hewitt, below in her case, in A4 in your appendix said, the facts for this phase of the case, oil and gas phase 2, claim 2, what we're talking about today, were developed jointly in lieu of an accounting by the government. In 2007, the party shared documents including leases, letters, and similar materials that have been supplemented by additional discovery. Also in 2007, the party shared expert reports where both sides did experts that discussed inter alia claim 2 and damage calculations. That's where the information on claim 2 came from. We didn't know about it at all. And to say that we should have known about it with the kind of record keeping that government was doing and where there's no, the fact that Mr. Sinofsky understood the 1916 Act and the 1938 Act, as I did too, would only say that we wouldn't think anyone would even think of doing a conversion from one to the other without going through the public advertise underneath. Thank you. Ms. Pepin? Yes. May it please the court, my name is Joan Pepin for the United States. This case concerns claims that occurred 60 years ago and are therefore barred by the statute of limitations. In 1948 and 1949, the tribes were presented with a request by the lessees on set and leases to convert those leases from the 1916 Act lease to the IML Act. Let me interrupt you and just direct you to what's giving me a little pause in this case and that is with respect to the trespass claim. Yes. The government's view is that there is no obligation for the government to act. They had no implied, there was an implied lease that there's harmless error. Can you sort of summarize why the government contends that this is not a valid claim, at least with respect to the statute of limitations question? The two clearest reasons why this is not a valid claim is, first of all, they have not fled it. This case, there are many, many claims in this case, which is divided into multiple phases. But all that's before this court right now is Claim 2, which is a claim that the 1916 Act lease should not have been terminated and that the plaintiffs are entitled to the royalties that they think they would have received if those leases had remained in effect. But didn't the Court of Federal Claims find that it was appropriate within the scope of the general pleading the way the case developed? Well, the court did address it. I don't think it did find that. So that's a good bound that it was appropriate to address the merits and did so. It did talk about it. That is true. The other most important thing is in order to plead a claim for a breach of trust, you have to identify a specific statutory or regulatory duty imposing this duty on the United States. And I heard Mr. Sachse quote from the Cherokee opinion, but he did not identify any statutory or regulatory duty imposed on the United States to remove alleged trespassers from these leases. And they have never identified any such duty. Are you saying that's a heightened pleading requirement or is that a proof obligation? No, it's a necessary element of stating a claim. And the Supreme Court held that in Navajo 1 very explicitly to state a claim. It's not a matter of proof. It's a matter of stating a claim for breach of trust. If you want to state that claim, you have to identify the statutory or regulatory duty that the United States allegedly breached. That has never happened in this case. I don't believe it will happen because no such duty exists under these leasing regimes. So because this claim is not stated, it's appropriate, although, albeit not for the reasons that Judge Hewitt did, but it's appropriate to affirm her judgment dismissing this claim because it has not been stated. There's no duty identified. Assuming that we agree with the Court of Claims that it's appropriately within the scope of the claims that have been asserted, how do you argue that violating the law in connection with these leases is harmless? I mean, I know a lot of people have been charged with violating the law. I would love to argue that it's harmless error and that they should dismiss an indictment, but harmless error, I don't know how it can apply where there's a statutory scheme that's very specific. Well, first of all, again, I don't know. With regard to the lack of competitive bidding, the reason it's irrelevant to Claim 2 is because of what Claim 2 asks for in form of relief. The entire theory that they put forward is the 1916 Act leases should have remained in effect, they should not have been terminated, and on renewal, the royalty should have been raised. And they would like to receive the money they think they would have been entitled to if that had happened. Okay. So, again, you're going back to the whole pleading thing. So you're saying all of your arguments turn on whether or not they used the appropriate magic words in the beginning? No, no, it's not whether they used the appropriate magic words, but if your theory is, I deserve the money, I'm owed under the 1916 Act leases, then it makes no difference at all whether the 1938 Act leases existed, were properly done, had technical errors. It doesn't affect their... Sure it does. Why not? If the 1938 leases are null and void because they were entered into illegally because the government failed to do the competitive bidding required under the statute, then they'd be back under the 1916 leases, would they not? No, they would not be. Those leases would have terminated, and the Court of Federal Claims did find that specifically, that the leases did not survive, and that has not been appealed, because they had expiration dates in them, and they were renewable by exercise of the option by the lessees. So there's no lease, arguably. So that's really a trust. If that claim was before the Court, and the leases were void, then there would be no lease. No lease. And then we'd be arguing today whether or not they ought to be done under the 1916 statute or the 1938 statute. It'd be up for grabs, right? No matter how you interpret the 1938 leases, if you interpret them as wholly void, if you interpret them as fully effective, if you interpret them as almost good enough, it doesn't change the fact that Claim 2, it's not just the claim, it's their entire theory. It's not that they didn't put the word trespass in there somewhere. It's that their theory is they are owed the 1916 Act royalties that they think they would have received if it had been increased over the years, that they believe it would have been. And therefore, it's only consequential to the measure of damages. Once you decide, if the Court would have decided, yes, you should have had the 1916 Act leases, then you would deduct what was paid under the 1938 Act leases. And that's the only place that the 1938 Act leases make a difference. Well, it does make a difference. If there is no lease and there is a trespass, then there is a continuing trespass. And the only question is whether the government has an obligation to remove the trespassers. So it makes a big difference on the statute of limitations, doesn't it? It doesn't make any difference to the statute of limitations about... It's very complicated. The statute of limitations would be different for the trespass claims. That one only goes back to 1973. And the problem there is not so much a statute of limitations problem, as it's a problem that they haven't identified a statutory duty or a regulatory duty in the United States to remove trespassers. I thought this went down on the statute of limitations. It did on Claim 2, the actual Claim 2, that there was a breach of a duty to keep the 1916 Act leases in effect. That happened in 1950 with the full knowledge and participation of the tribes. They voted for this. They enacted tribal resolutions requesting this. And they signed the leases. So all of the material facts, all of the actions that ever occurred, happened by 1950 and everybody knew about them. Maybe Mr. Sachse didn't personally know, but that's what the tribes knew. Yeah, but we're talking about the trespass claim. Now, assuming, as Judge O'Malley has suggested, that we don't buy into this waiver thing. So we think somehow, somewhere, that's pled well enough to get us into Claim 2. So we're just dealing with the trespass question. And indeed, I mean, the government didn't acknowledge that they had failed to bid until, what, October 2009? Well, again, Your Honor, the tribes were fully aware of the fact that these leases were just issued to the new lessees in 1950. If you look at the actual tribal resolutions, it's what they specifically requested. It's what was presented to them. It's what they voted on. And it's what they did. And then they signed those leases with the new lessees. So that's your implied license theory, but isn't that directly at odds or contradicted by Southern Pacific? I mean, don't you lose on that theory? No, it's not an implied license theory at all. I'm saying that to the extent that any Statute of Limitations claim is grounded on them not knowing until the 2000s that these leases were not competitively bid, the tribes knew in 1950. I don't think that's what Judge Post has said. That's not a Statute of Limitations problem. Assuming there were no leases and the government had an obligation under the statute, then you've got a continuing violation, don't you? Under Southern Pacific, under Bunch. Bunch, if the court is going to decide whether the leases were valid, which I don't think the court should decide because there's been no duty to remove trespassers shown. But if the court were to go there, then I would respectfully suggest that the order is to file a supplemental briefing because it is tremendously complicated. In Bunch v. Culver... Well, there's a possibility of supplemental briefing. There's also a possibility of sending it back to the Court of Claims because the Court of Claims really never dealt with these issues in the first instance. I mean, she dealt broadly with trespass but not specifically on the kind of questions we're asking here, right? Right. And of course, one of the things they would have to do in such a situation is, as the Supreme Court has repeatedly required, identify a specific statutory and regulatory duty to remove trespassers. And it hasn't happened even though they've been informed that that would need to happen. They've never identified that duty. Though they're currently regulations, right? In the Onega case, they referred to 2001 government regulations that would establish a duty. Those regulations explicitly do not apply to mineral leases. So they would not apply in this case. And I'm not personally aware of any that do apply in this case. But you do concede, the government does concede, that these leases were illegally entered into. Or entered into without complying with all the statutory requirements. We acknowledge that there was not competitive bidding and that there should have been. Yes, that happened. It happened with the full knowledge of everybody involved at the time. It was a mistake. It turns out to have been a harmless mistake and it is also a mistake that does not affect claiming. We don't know whether it's harmless or not. I mean, how can you say it was harmless? How do we know? Because there... It could be that the competitive bidding, I mean, leaving aside all the other claims, it could be the competitive bidding would have resulted in leases that are far more lucrative to the tribes. How can we possibly know that without any information on the record? Two things, Your Honor. First of all, there is information on the record provided by their experts. We've cited it in the appendix. You can see, well, it's voluminous, but we've put a couple pages of it in the appendix at... It's near the end. I'm sorry, I'll have to find it for you. Oh, yes, it's these tables about page A230, A231. But the point is that their expert calculated what he thinks they should have earned and what they did earn. And those are exactly the same until 1968. And so the evidence from their own expert is that these leases, whether without competitive bidding, were actually let at the market-appropriate rates. Because even what their expert says they should have gotten is exactly what they've got. So that's one piece of evidence. And the other important fact is, again, the claim that they have brought in claim two, not the other 11 claims that are part of phase two, not the claims that are part of all the other phases of this case, but the claim that's actually before this court, is that they should have had their royalties under the 1916 Act leases, as they imagined they would have been amended over the years. And that they might have had to deduct what they actually received. And so what they might have received under a third hypothetical lease doesn't really make any difference. It only has to be deducted anyway from what they think they would have earned in the 1916 Act leases, which are undoubtedly more, because they can be adjusted upwards. Again, Your Honor, I'd just emphasize that with respect to the trespass claim, the Supreme Court has been abundantly and repeatedly clear that you have not stated a claim for a breach of duty by the United States, unless you identify a specific regulatory or statutory duty that imposes this duty on the United States. That has never happened in this case, and so they have not stated a claim for the United States to remove trespassers, which is, for instance, therefore appropriate to affirm the Court of Federal Claims judgment dismissing this claim. Well, is there any authority in the Court of Federal Claims to even address this ejection motion? This could be not a... It's not a contract or what have you that's within their jurisdiction. It strikes me as sort of... I mean, it sounds untoward. They don't have any jurisdiction over torts down there. I guess to the extent it's a claim for damages for failure to do it, but, again, it would have to be... A duty would have to be identified in order to state a claim. Thank you, Your Honor. We ask that you affirm the judgment of the Court of Federal Claims. I think you've got about two minutes left. I want to say we disagree with Judge Hewitt on a few things here, but we do not disagree with her on her understanding of federal pleading. And she was very clear. We made basic claims at the beginning and we've made them broader and broader as the information came in and that's exactly what the federal pleadings call for. But the government's arguing, essentially, that the Supreme Court has imposed a heightened pleading requirement on claims like this where you have to actually identify the specific regulatory... We've identified... Excuse me. I'm not... I'm sorry. ...the specific regulatory provisions that you're relying on. What I'm saying is we're relying on the 1938 Act. It requires this public bidding. If somebody does act in a way that is illegal, then the government has violated that act and they've got to be responsible in damages. The 1938 Act couldn't be clearer than that and the Court's already held that... And how does that relate to your 1960 claim which is the essence of the claim, too, that you've alleged throughout? Well, it's not the essence. The essence is the conversion was illegal. We've been very clear on this ever since the facts came out, which was after our pleadings were done, that the conversion was illegal. They had no right to change a 1960... They could have terminated the 1916 Act legally and then advertised under the 1938 Act and that would have been all fine. And ten years later, the government actually wrote letters to that effect and told an oil company, yeah, if you want to switch the 1938 Act, you've got to terminate the 1916 Act and then put this up for public bidding. And the oil company said, no thanks, we don't want to do that. And as far as harmless error goes, and you're exactly right, Judge Brose, that if this had been... This is meaningless to say that the bids at that time were just a one-eighth royalty because if producing property had been put up for public bidding, other oil companies would have bid on that and they might have bid much higher royalties and very big bonuses to get property that's already producing. Your time has expired. Thank you. Both parties for their arguments. Thank you.